**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>  Plaintiff,<br><br>v.<br><br>Esteban Jose Medero-Velazquez,<br><br>  Defendant. | No. CR-22-00881-001-TUC-JGZ (MSA)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is Defendant Esteban Medero-Velazquez's motion to suppress. (Doc. 28.) The motion has been fully briefed, and an evidentiary hearing was held on June 21, 2022. (Docs. 29, 31, 41.) For the following reasons, the Court will recommend that the motion be denied.

## Background

On April 1, 2022, Officer Robert Holguin was patrolling Highway 80 when he received a radio call about two northbound vehicles driving in tandem. (Tr. 7–8.)[1] A few minutes later, Officer Holguin encountered one of the vehicles traveling westbound along the Double Adobe Highway. (Tr. 10.) The vehicle, a Ford Expedition driven by Defendant, had a temporary license plate and "extremely dark" window tint. (Tr. 10–12.) After following the vehicle for a short distance, Officer Holguin initiated a traffic stop based on a suspected window-tint violation. (Tr. 11–12.) A second patrol officer also stopped. (Tr. 12.)

---

[1] "Tr." refers to the transcript of the evidentiary hearing. (Doc. 42.)

1    Officer Holguin approached the vehicle, stopping at the rear door on the driver's
2    side. (Tr. 13.) He could not see into the vehicle, as the rear window was heavily tinted, so
3    he asked Defendant to roll the window down. (Tr. 13.) Defendant complied. (Tr. 13.)
4    Observing no passengers, Officer Holguin then walked up to the driver's window. (Tr. 13.)

5    After advising Defendant of the reason for the stop, Officer Holguin tested the
6    vehicle's window opacity. (Tr. 13.) The windows were darker than permitted by state law,
7    so Officer Holguin requested Defendant's driver's license, vehicle registration, and
8    insurance information. (Tr. 14.) While Defendant searched for the documents, Officer
9    Holguin looked through the open windows and observed camouflage through a vertical
10   gap in the second-row seat. (Tr. 14–15.) He recognized the camouflage pattern as the type
11   commonly used by noncitizens who traverse the desert. (Tr. 14–15.) The camouflage
12   reached about halfway up the seat, giving Officer Holguin the impression that there were
13   camouflaged people laying on the floorboard behind the seat. (Tr. 15, 35.) Officer Holguin
14   testified that he was able to observe the camouflage from his vantage point at the driver's
15   window, and that no part of his body crossed into the vehicle. (Tr. 15, 19, 36–37.)
16   Defendant maintains that Officer Holguin stuck his head through an open window.
17   (Tr. 84–85.)

18   Defendant provided his driver's license, which listed an address in the Phoenix area,
19   and the vehicle registration, but he could not find the insurance document. (Tr. 14, 18.)
20   Defendant gave an uncertain answer about the vehicle owner, stating initially that "he
21   didn't know who the vehicle belonged to" and then that "it was a friend's vehicle." (Tr. 59.)
22   Officer Holguin then had Defendant exit his vehicle and walk towards the patrol vehicle.
23   (Tr. 16.) At this point, Officer Holguin instructed the other officer to radio dispatch and
24   have United States Border Patrol respond to the scene. (Tr. 16.) Officer Holguin did not
25   tell Defendant that he had observed camouflage, or that he had requested assistance from
26   border patrol. (Tr. 16.)

27   Officer Holguin began filling out the ticket once he got back to his vehicle. (Tr. 18.)
28   This took him between seven and 15 minutes. (Tr. 18–19.) Around the time he began

writing the ticket, he also requested a records check. (Tr. 17–18.) The check showed that Defendant's license was valid, and that the vehicle was registered to a woman out of Douglas. (Tr. 18.) Defendant waited by the front of the patrol vehicle while Officer Holguin completed these tasks. (Tr. 39.)

Border Patrol Agent Matthew Infante arrived just as Officer Holguin was finishing the ticket. (Tr. 19.) After issuing the ticket, but before Agent Infante walked up, Officer Holguin asked Defendant who was in the back seat, and Defendant responded that he was "just giving them a ride." (Tr. 19–20.) Officer Holguin then informed Agent Infante about the camouflage and Defendant's admission. (Tr. 20.) Agent Infante looked inside the vehicle and observed two people sitting on the ground behind the second-row seat. (Tr. 70.) Upon questioning, both admitted that they lacked authority to be in the United States. (Tr. 72.) Defendant was then arrested. (Tr. 72.)

**Discussion**

**I.    Unlawful Search.**

Defendant contends that Officer Holguin committed an unlawful search by leaning into the vehicle. He is correct that "a physical intrusion into the interior of a car constitutes a search." *United States v. Ngumezi*, 980 F.3d 1285, 1288 (9th Cir. 2020). The Court finds, however, that no intrusion occurred here.

This conclusion requires the Court to resolve a conflict in the testimony. Officer Holguin testified that no part of his body ever entered Defendant's vehicle. (Tr. 15.) Defendant, in contrast, testified that Officer Holguin "st[u]ck his head inside the car." (Tr. 84.) Having had the opportunity to listen to both witnesses' testimony and observe their demeanors while on the stand, the Court adopts Officer Holguin's version of the events. On both direct and cross-examination, he was firm that he did not enter the vehicle, and he was consistent and clear about what he could see from his vantage point outside the driver's window. (Tr. 15, 19, 47–48.) Defendant, however, provided no details about Officer Holguin's alleged conduct. For instance, Defendant did not clarify whether Officer Holguin leaned through the front or rear window, nor did he state how long Officer Holguin

1 was across the vehicle threshold. Based on these factors, the Court finds Officer Holguin's testimony more credible.

## II.  Prolonged Traffic Stop.

Defendant contends that the traffic stop was unlawfully prolonged. As discussed below, the Court disagrees.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022) (alteration in original) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). The police "may not extend a traffic stop with tasks unrelated to the traffic mission, absent independent reasonable suspicion." *United States v. Landeros*, 913 F.3d 862, 866 (9th Cir. 2019) (citing *Rodriguez*, 575 U.S. at 357–58). On the current record, it appears that Officer Holguin prolonged the traffic stop. He testified that the stop began at about 9:00 a.m. and lasted "20 minutes max." (Tr. 43, 63.) He offered no explanation as to why this stop may have taken 20 minutes when his stops "historically" last no more than 15 minutes. (Tr. 38.) As the alleged infraction (a window-tint violation) was minor, a 20-minute stop would suggest that Officer Holguin was stalling until border patrol arrived.

Assuming the stop was prolonged, it was nevertheless justified by reasonable suspicion of alien smuggling. An officer has reasonable suspicion when, under the "totality of the circumstances," he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The reasonable-suspicion standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418). This "level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

In the border-stop context, relevant factors "include characteristics of the area,

proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (en banc) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975)). In this case, several factors support a finding of reasonable suspicion. The stop occurred about 10 miles from the United States–Mexico border, near Douglas, Arizona. (Tr. 15.) This is significant not only because of the proximity to the border, but also because the Douglas area is a "notorious" pickup point for undocumented immigrants. (Tr. 15.) In addition, Defendant was stopped while traveling westbound on the Double Adobe Highway, which is not a "common" route for someone traveling towards Phoenix, where Defendant lives. (Tr. 18, 59.)

The vehicle's characteristics are also relevant. The window tint was dark enough to conceal possible contraband or vehicle occupants, as Officer Holguin "could not see anything" through the windows. (Tr. 29.) The paper license plate was suspicious because, in Officer Holguin's experience, such plates are "used a lot by persons smuggling illegal aliens . . . simply for the fact that it's a piece of paper" that can be falsified. (Tr. 61.) Furthermore, the vehicle was not registered to Defendant, and Defendant gave an uncertain answer about the identity of the owner.[2] (Tr. 15.) Finally, Officer Holguin observed camouflage behind the second-row seat. In Officer Holguin's experience, the pattern of camouflage he observed is a telltale sign of smuggling activity because it is frequently used by noncitizens traversing the desert and it is distinct from patterns used for other purposes in Arizona. (Tr. 35–36.)

Officer Holguin encountered a suspicious-looking vehicle taking an indirect route away from a notorious alien-pickup area. Defendant was ambiguous as to who owned the vehicle, and the vehicle contained a clear indicator of alien-smuggling activity. Based on these facts, Officer Holguin had a particularized and objective basis for suspecting

---

[2] According to Defendant, he told both officers that he had just purchased the vehicle. (Tr. 84.) Officer Holguin denied that this occurred. (Tr. 37–38.) The Court finds Officer Holguin more credible.

Defendant of alien smuggling. Therefore, the prolonged stop was justified by reasonable suspicion.[3]

### III. Custodial Interrogation.

In response to a question from Officer Holguin, Defendant stated that he was giving a ride to the people hidden in his vehicle. Defendant argues that this statement must be suppressed pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The Court disagrees.

Under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. For purposes of *Miranda*, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). A defendant is in *Miranda* custody only if (a) a reasonable person under the same circumstances would not feel "at liberty to terminate the interrogation and leave" and (b) "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 509 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The second element is missing here. Unlike stationhouse questioning, "which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek," questioning during a traffic stop is "presumptively temporary and brief." *Berkemer v. McCarty*, 468 U.S. 420, 437–38 (1984)). And because traffic stops occur in public and typically involve only one or two officers, "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." *Id.* at 438–39 (quoting *Miranda*, 384 U.S. at 445, 491–98). Thus, "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of

---

[3] Officer Holguin also relied on the report of tandem driving. (Tr. 15.) There is no evidence that Defendant was in fact driving in tandem, so that factor has minimal, if any, significance. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1139 (9th Cir. 2000) (en banc) (stating that "the circumstances of the tandem driving will in the end determine whether that factor is relevant").

*Miranda.*" *Id.* at 440.

The testimony establishes that Defendant was subjected to a routine traffic stop. The stop lasted approximately 20 minutes and occurred on a public roadway. Officer Holguin informed Defendant of the reason for the stop, requested Defendant's documents, conducted a brief records check, and wrote and issued a citation. The only circumstance out of the ordinary was the arrival of Agent Infante. Agent Infante's brief presence, however, does not turn this otherwise innocuous stop into the equivalent of stationhouse interrogation. Therefore, Defendant was not in *Miranda* custody at the time of his incriminatory statement.

* * *

**IT IS RECOMMENDED** that the motion to suppress (Doc. 28) be **denied**.

The parties shall have fourteen days from the date of service of this recommendation to file specific written objections with the district court. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2). The parties shall have fourteen days to file responses to any objections. No replies may be filed absent prior authorization by the district court.

Dated this 17th day of August, 2022.

_____
Honorable Maria S. Aguilera
United States Magistrate Judge